So I have a couple of preliminaries. One is, frankly, that the help we got from all the parties in this case was a lot to be desired and had us scrambling and was not the way we expected to be treated by the parties with regard to not giving us information about opinions that were issued several months ago and several days ago and that certainly seem extremely relevant to what we're doing here. So it was really difficult to work with and I hope that you'll do better in the future. The second is, and if anybody wants to give me an explanation, I wouldn't mind hearing it, and that goes to both parties because the board was a party to Judge Mosman's case and to the ALJ opinion obviously and the ILWU obviously knew about it, as did the employer, so it's really kind of a mystery. And secondly, I'd like to know if either side is splitting argument, I'd like to know how it's being split. I'm sorry, Your Honor, I didn't hear the last part. If either side is splitting the argument. I see that not the ILWU but Hooks has three different lawyers listed and I don't know who's doing what, so when you get up, it would be nice to know what you're doing. Okay. Thank you. Thank you, Your Honor. My name is Robert Remar, representing the ILWU.  Reply, please. The basic problem with the injunction and with the board's prosecution of the injunction here is that it suffers from a lack of a valid legal theory. The injunction, the court's decision in the trial court, and the board's theory all fail to apply the correct legal principles that have been set out by the U.S. Supreme Court in the ILA cases from 1980-1985. Those cases hold that fundamental to the operation and realities of the longshore industry, not just on the East Coast and Gulf Coast but the West Coast as well, is the fact that the steamship lines, the carriers, have the plenary absolute control over the handling of their own containers. This is a ruling, this is a reality, and an understanding that the longshore industries in both the West Coast and the other coasts of the United States have applied to build and to administer our collective bargaining agreements, our joint labor relations committees, and our bargaining and bargaining strategies. It is an extraordinary proposition that suddenly, despite the fact that the U.S. Supreme  Supreme Court in the ILA cases, it is an extraordinary proposition that suddenly, despite the fact that the U.S. Supreme Court has failed to apply the correct legal    And that's just the way the argument goes to both. I want to know what your argument goes to. Breyer. My argument is that both fail as a matter of law. Kennedy. Okay. Can I – are you now focused on the right to control ruling? Yes. Okay. Yes. And the right to control is established by the facts that were submitted at the ULP trial before the ALJ, the facts that were submitted to the district court in the Section 10L proceeding. And that goes to the 8b-4b. It goes to the 8b-4b. And it's a two-pronged test of which the second is traditional work. Correct. And this work has been done for 40 years by electrical workers at this port. The work – that's correct. The work was done. Okay. So what do these old cases have to do with this very specific local tradition here? The right to control isn't relevant if it's not traditional work, right? That's right. Right. So that's sort of a logically prior issue. The traditional work issue is one that's identified not just in terms of the particular terminal or the particular port of Portland that our case deals with, but with respect to the bargaining unit itself. We have a coastwise collective bargaining unit. We have a bargaining unit in which longshore workers are integrated like the employer operations. People travel from port to port, from terminal to terminal. They get dispatched out of a single dispatch hall. They're all paid through the multi-employer association. And the reality of these unique features of the bargaining unit is one that was emphasized by the Second Circuit in the Bermuda container case in which the Second Circuit held that the nature of bargaining provides that if you have traditional longshore work for large sections of the multi-port, multi-employer single bargaining unit, then it is fair to seek and preserve that work in areas and in pockets where you may not have established your jurisdiction yet. It's also important to understand that what we're talking about here is work related to containers. This is one of the last vestiges, I guess, or pieces of work that was generated by, created specifically by containerization. Okay. Can I just get a feel then for the history? If, in fact, Portland has been operating for all these years with the electricians, IBEW doing the electrical work in these reefer units, how has that survived all these years without, you know, all the problems you now say will cascade from upholding the rulings, basically, that said Portland does have the right to control and has done it. So I'm not following the practice. Yes. You know, you're painting an awful picture for the uniformity of the bargaining process, but it's not a new problem. The problem is, that's an excellent question, Your Honor, and it goes right to the heart of the question. I only ask excellent questions. All right. Sorry for the commentary. It's okay. The distinction here is that during this 40-year or 38-year period, the Port of Portland served not as a landlord port, but as an operating port. The Port of Portland itself took on the responsibility for operating, managing, employing the workers at its own facility. So, and it was not part of our coastwise collective bargaining unit. And that remains true with respect to certain employees, including these employees. You're talking about the electricians? Yes. The electricians, that's right, have never been employed in our collective bargaining agreement. Of course they're not. That's true now. We don't want them in the bargaining unit. Well, I understand. But the problem with your argument, it seems to me, is that this is continuity, so that you're going after it. But as you said, for 40 years, the port was run, or for a long time, by the City of Portland. I guess there was an interim manager, a prior manager for a while. Yes. And but this work was always done by employees of the Port of Portland, and it still is. It is only because the ICTSI chooses to have that work done by the port electricians. That's the only reason why. Unless I'm incorrect, these electricians are not their employees. They're the port employees. That's right. Right. But all of the work that they're performing, and this is clear in the ALJ decision as well, all of it, all of the work that the electricians perform have to do with the longshore operations. They come from other locations, come and they do this. Can I back this up just on two sort of what the surrounding legal situation? First of all, what are we looking for on a 10L in terms of the legal theory? Are we looking for a plausible legal theory or something more than that? We're looking for a valid legal theory. Valid, not plausible? Right. I thought the case law says plausible. Well, plausible in the sense that there is basic legal principles that support the government's prosecution and then the plausibility that those legal principles would apply in the particular case. And secondly, the we have the ALJ opinion now, and we had asked for briefs about how that influences our decision, but I gather that on this prong, the 8B4B prong, the challenge to the composition of the board is basically irrelevant and we don't need to worry about it. Correct. And thirdly, the injunction would be the same if we took out the 8B4D, although there would have to be an amendment to the injunction because it does mention 8B4D. That's correct also. But the substance would be the same. Yes. Yes, that's right. I think that with respect to the 8B4D, we get into the question about whether Judge Mossman's order has any play with respect to this particular appeal. Well, I don't see how it doesn't because he has vacated the 10K. He may be wrong. We may end up reversing him. In the meanwhile, that issue isn't before us and there's no 10K. Is that right? That's right. That's our position. That's exactly right. But what I was leading to was that this Court doesn't necessarily have to go down that path, that the injunction is invalid and should be vacated on its own terms based on the fact that even if you assume that there's a valid Section 10K award, that filing grievances against the carriers who are in the role of the general And that proposition is supported by your agency. Well, that's on the theory about the subcontracting cases. And, you know, as I'm reading along in there, I'm thinking, oh, but isn't there an 8B4 right there if you're actually limiting subcontracting except in the construction industry? And then there was a footnote to that effect in the, I think, the ALJ opinion somewhere. Isn't that true? I mean, can't you not partake of the subcontracting notion precisely because you're not in the construction trades and you're not saved by 8E? No, Your Honor, because we're not saying that you can't have subcontracting unless it's to a union contractor. What we're saying is that members, employer members of the bargaining unit or the bargaining unit association have an obligation to not subcontract outside our bargaining unit. Our bargaining unit is a integrated, singular, coastwise unit. And as long as they So you're arguing for a work preservation subcontracting clause, essentially? Sorry, I didn't understand. You're arguing for a work preservation subcontracting clause? Yes. So then you're back in the same place again. It has to be work preservation or else it doesn't work. That's exactly right. And that's why I started with the discussion about the elements for work preservation, which are right of control and traditional longshore work. And you're arguing that traditional longshore work is sort of divorced from the particularities of the particular location. I'm sorry, Your Honor. That the traditional longshore work is divorced from some mega concept that doesn't have to do with a particular location or a traditional history or locational specific history. Not quite, Your Honor. Our position is more nuanced and more specific. Our position isn't that because the ILWU represents longshoremen, that this is our jurisdiction, that this is our division of work. Our focus is on the nature of the collective bargaining unit and the way it was established by order of the NLRB back in the 1930s. And the bargaining unit defines the work very, very broadly. And in terms of a multi-employer, multi-location situation, the courts and the board have said that where you have established work patterns within the multi-employer bargaining unit, that the fact that you haven't had that particular work performed at a particular location doesn't prevent the union and the employers from deciding that they're going to now assign the work to the bargaining unit, especially when the work is created as a result of new technologies that have replaced traditional other types of longshore functions. You're going to run out of time, so if you want to save some time, you should do it now. Yes. If you don't, that's okay, Jim. Quite right. Thank you. May it please the Court, Robert Otis for the National Labor Relations Board. Your Honors, before I begin with my argument, I will be using ten minutes of time for the labor law issues. Melissa Patterson for the Department of Justice will have three minutes to address the Court. And Michael Garone for MECAS ICTSI will have two minutes to address the Court. Your Honors, I only want to address two — well, actually, the first thing I want to say is I apologize as far as Judge Mossman's decision. The board was in a bit of transition at that point in assessing whether to appeal that order. But that doesn't matter, does it? I know. We should have allotted it. It's not an excuse. It's just by means of an explanation. We wanted to give the Court the full picture of what was going on. But it really doesn't matter, because right now you have a vacated 10-K and we're all, you know, sending our law clerks around and spinning our heads about how does the 10-K fit onto all this, and then it turns out there isn't one. Fair enough, Your Honor. But as was set forth in our letter brief, the board's position here specifically is that you can affirm the injunction in full based solely on the Section 8B4B secondary boycott allegation. And had we known that, we would have wasted a lot less time. Again, Your Honor, my apologies. We'll send you the bill. Fair enough. We can do that, you know. We can tap into the Labor Department's budget and transfer it to the judiciary. Hopefully not my salary, but anyway. I just want to make two general points here, that the district court did not abuse its discretion in finding likelihood of success on the Section 8B4B allegation and that it found that the balance of harms tips sharply in favor of injunctive relief here. Regarding the 8B4B allegation, the only issue is whether there was an unlawful work acquisition objective or a lawful work preservation objective. And here the district court properly found that the union could not satisfy either prong of that test. Number one, as the court has already noted, the electrical workers have performed that work for almost four decades. During that entire time, the longshoremen did not believe that that was work that they traditionally performed. The ALJ in the underlying administrative case similarly rejected the work preservation objective, saying that, noting that this was work acquisition where the longshoremen had never performed that work. I asked your opponent, I'm asking you now, is the standard traditional likelihood of success? Is it something less than that? What exactly is standard with regard to that? I believe this Court has repeatedly said that it's some evidence in support of an arguable legal theory. That's evidence. Arguable legal theory. Arguable legal theory, yes, absolutely. But we've also said that it's the usual primary injunction standard. So there seems to be some tension there. Right. Well, I think in labor and injunction cases, the Court continues to apply the sliding scale, so there is some leeway there with a lesser showing on the merits and a stronger showing on irreparable harm, which, again, the district court here found tips sharply in favor of injunctive relief. It results in the injunction. Now, what is, I mean, the threats that are out there are, or the pressure is a, there were in the past threats which are detailed by the ALJ, but that's not prospective and it's not what the injunction is about. The injunction seems to be about only the grievances or the grievances have been withdrawn. Where are we on this? I believe because of the injunction, there can no longer be process. The only thing that has been appealed, let me take a step back. The district court issued an injunction against grievances against lost work opportunity grievances against ICTSI, as well as the Section 301 lawsuit to enforce the arbitration award against ICTSI. That has not been appealed, so that aspect of the injunction is not being challenged. The only thing that the longshoremen have appealed are the grievances against the carriers, the lost work opportunity grievances against the carriers. So that is the only issue remaining here. And as far as that goes, again, the issue there under the AP4B was whether it was work preservation. The district court properly rejected the, rejected that. The other point I just wanted to make under that is that there's no threat here, there's been no diminution to the longshoremen work as a result of the electricians performing this work. There are no threats to IOWU jobs because, again, there's nothing to preserve here. It's been 40 years where the electrical workers have been performing that work. And in light of all those considerations, again, we would say that the district court didn't abuse its discretion in finding likelihood of success. Kagan. IOWU is also arguing, and did argue here today, that in any event, the filing of these grievances is not secondary as I understand it. Right. Well, I mean, again, they're getting at to the right of control prong of it. I think solely if, on that first issue that I discussed, if they didn't traditionally perform the work, that shows that it's secondary because they're trying to obtain work from the port. No, I understand their argument to be more, I understand their argument to be that filing against the carrier, that even if putting pressure on ICTCI would be a problem that filing against the carriers for essentially not abiding by their contractual obligation because they have a contractual obligation is similar to filing against general contractors who subcontract to one set of subs who have, and not to other sets of subs. And the notion is that you can basically, if somebody has made an agreement with you not to do X, you have a right to grieve that even though you don't have a right to get the work. I think I would answer that under, in two ways. Under the 8b4b, I think this Court's decision in Associated General Contractors of California, 514F2nd, supports that, that kind of a lawsuit here where the carriers do not control the work, is unlawful, secondary activity. It's essentially the same rationale that the Supreme Court adopted in the Enterprise Association of Pipefitters case in which both the district court and the administrative law judge relied on to find, to reject the work preservation claim here. If you're addressing the 8b4d aspect of the case, again, Your Honor, I think you were going down the road that the board was as well, is they're trying to adopt a principle from the construction industry which has a, is an exception to the Section 8e hot cargo. Right. Exactly. And it wouldn't apply in this situation. As the district court properly pointed out, number one, there's no subcontracting clause in the PCLCD. The district court couldn't even find that. Here, the longshoremen essentially recognize that flaw, and they say that an arbitrator can infer such a clause. But under the only thing they cite in support of that is this Court's decision in Edward Hines Lumber, and in there the no subcontracting clause was inferred from what was happening at the location. Here, the court has performed the work, so that would undercut their argument there. And third, again, if there was a no subcontracting clause and there's no work preservation objective, it's unlawful under Section 8e. In light of all of those pitfalls in their argument, again, we would say that the district court didn't abuse its discretion in finding that that line of cases is completely inapplicable here. Okay. And moreover, Your Honors, just two quick points. We thoroughly reject that the carriers here have the right to control the work. As was shown in the terms of the lease with ICTSI, the port retained control of the work to make sure that its employees who are represented by the electrical workers continue to have that work and are not divested of it. Whenever the carriers began to threaten the port that they would bypass them, and then they actually bypassed them, again, the port would not accede to that demand. And that's the flaw in the union's argument here, is regardless of what the carriers may ask the port, it does not have to accede to that demand. And so they remain in control of the work. And, again, that's essentially the rationale that the ALC. I've always found this very mysterious. It's also true that ICTSI didn't have to sign that lease that way. They might not have gotten the work, but they didn't have to sign the lease. They signed it before they were a PMA member, Your Honor. I'm sorry. Go ahead. I'm sorry. They might not have gotten the job, but they didn't have to sign the lease that way. They did sign the lease before they were a party to the PCLCD at that point. Right. Okay. So at that point, whenever they entered the lease with the port, they didn't have a conflict of interest. But they still didn't have to sign the lease that way. And it's hard to talk about control when you have two parties. Well, they did have to sign the lease that way. The facts show that when they're ---- To get the job. Excuse me? To get the lease. Yes, because the port only accepted bids. It was clear that they would only accept bids with the understanding that they would retain control over that work. So in that situation, they had no choice. But really, ICTSI isn't the player here. It's the carriers. And as the ALJ also found, the carriers here have to essentially purchase time at the terminal, and they have to agree to the work relationships in place there. Your Honor, I'm quickly running out of time. The balance of harms does tip sharply in favor of relief here. The union only requests monetary relief as opposed to remedial failure for the board if the grievances go ahead. And I will give the remainder of the time. Thank you. My colleagues. May it please the Court, Melissa Patterson for the appellee. This panel has indicated it will not hear argument on the merits of the constitutional question, but it indicated that the parties could address, if successful, what impact that would have on this case. And the answer is none, because appellant here waived any constitutional challenge to the validity of the board when it issued its 10-K by failing to raise it before the district court. So should this court have occasion to reach that issue, it should hold the appellants to their waiver. This is not a jurisdictional issue, as the Supreme Court has made clear. Nor do any of the circumstances that would excuse the waiver exist here. And they waived it. Your position, as I understand it, is that they waived it in the district court here. In other words, as a matter of judicial administration, it isn't so much that they waived it before the board as if they waived it here. Yes. Their waiver came in failing to bring it to the district court's attention. This is a 10-L proceeding, so it's not a direct review of a board decision. The 10-E bar discussed in Noel Canning has no relevance to this proceeding. So that is, in fact, their only, as I understand their opening brief, their only argument for why this court should wade in on that issue despite their failure to raise it before the district court. That was about an entirely different jurisdictional bar that has no relevance to this 10-L proceeding. If the court has no further questions on why it should consider this issue waived in the district court, I'm happy to take questions. Kagan. I gather that the courts of appeals have held both ways, but your position is the Supreme Court law controls. The 11th, 6th, and 8th circuits have all clearly indicated that these recess appointments challenges are waivable. I think the both ways Your Honor is referring to is the Third Circuit in the new Vista case. Now, we disagree with that analysis, but even if it were correct, I don't think it would have any play in this case, and that is because that was on the petition for review of a board decision, and there the Third Circuit indicated that the body of law stating that appellate courts have a special obligation to review the jurisdiction of the lower tribunals, that that meant that they had to review the, quote, jurisdiction of the board when it issued its order. Again, here, the lower tribunal is the district court, and everyone agrees that the district court had jurisdiction under 10-L. So even if new Vista were correct, with which we strenuously disagree per our petition for a rehearing en banc, it wouldn't apply here. So I don't know that there's any court anywhere that has suggested that either that it can't, an issue in this type of proceeding cannot be waived or should not be held waived. Thank you very much. Thank you. Thank you. May it please the Court. Michael Garone for the amicus ICTSI, Oregon, Inc. First, on the standard. This Court's cases, the Overstreet case, the Frankel v. HGH Corp. case, make it clear that all the NLRB has to do is present some evidence in support of the existence of an unfair labor practice as well as an arguable legal theory. I would submit that the NLRB has presented way more than that in this case. They've presented substantial and significant facts and a valid legal theory that has been accepted by the ALJ, who's an expert in labor law, has been accepted by the district court judge. And although the Section 10-K decision was set aside based upon a technicality, all three board members who decided that case also ruled in the same manner as the ALJ and the district court judge. So here we have way more than just some plausible argument. I think we have a valid argument. But I don't think your court has to go that far. I think all you have to do is say it's plausible. Clearly, on this background, it is plausible. Mr. Remar concedes that even if the 8b-4d allegations go away because of the Judge Mossman ruling, that the 8b-4b allegations still stand, and there is no reason to believe that the 8b-4b allegation does encompass, I mean, just be lopping off a sentence. It forbids the same conduct by the carriers. So I would like to briefly talk a little bit about the carriers. Number one, the carriers don't have contractual obligations under the labor contract to ensure that all maintenance and repair work is done by ILWU members. All up and down the West Coast, there are non-ILWU members who perform maintenance and repair work on the docks with regards to the loading and unloading of vessels. They either do it on containers or they do it on cranes. This is not just, you know, hegemony where it's all done by one particular union. Let me ask a question just because I'm curious. How much work are we – are we talking about one person a day here? What are we talking about? We're talking about one or two jobs, Your Honor. And we didn't choose. My client did not choose to have this work performed by the electricians. It was foisted upon us by the Port as a non-negotiable condition of taking over the lease. This is a 25-year lease of a terminal, which is a major economic engine in the State of Oregon. And in that respect, I think you should look at Judge Simon's findings about the effect on the local and regional economies that would result if the terminal were to go out of business, which is ultimately what the ILWU's actions could actually result in. And there were findings made by Judge Simon on that. And I noticed – oh, I still have some time. Okay. I think we've heard – I think we understand where we are. So thank you very much. Okay. Thank you. Mr. Riedemar. Thank you, Your Honors. Firstly, the ILA cases in Calcartage all involve similar scenarios as our case, which is the work at issue that was to be assigned to ILWU longshoremen and ILA longshoremen was work that had been performed for decades by Teamsters, by other unions. But didn't these cases arrive – is that true? They had already been done by Teamsters and so on? Or this was all occurring at the juncture at which the containerization was happening and the question was who was going to do the work? No. Because of the slow process of the law, as well as the delays in filing grievances and getting them resolved under their collective bargaining agreements and then trying to get them enforced, containerization began in the late 1950s, started in the late – and then in the early 1960s. And it wasn't until the end of the 1970s, early 1980s, that these cases were being fully litigated and argued. The Calcartage case has what I consider to be a zinger of a quote on this issue. It says, quote, but as is surely clear after ILA 1, the fact that longshoremen have never previously performed work at the exact same location does not prevent the work sought from being the functional equivalent of work that longshoremen have performed. The reason for the functional equivalency is because they were trying to define what is traditional longshore work. What is within fair preservation as opposed to unfair work acquisition? But in that case, what – who was doing that work at that juncture and for how long? The Teamsters, in the particular case of the ILW and PMA case of Calcartage, the Teamsters were representing the warehousemen employed by Calcartage, who was the primary charging party against the provisions of the ILW-PMA agreement. And they had been doing that for many, many years. As a result of the two Supreme Court rulings, it's important to understand that we had having to be closed down. Each of them had their own workforces that were completely independent of the PMA operations. And each of them had to close down. And all of that work ended up getting shifted over to the ILWU, this bargaining unit on the coast. If you look at the fine print in these cases, you will see the consequences of it. And this is why the Court also emphasized that it doesn't matter what the impact is or effect is on third-party employers or third-party workforces like the Teamsters. What matters is whether or not the work is one that is consistent with traditional work patterns of that particular bargaining unit. The opposing – You're out of time, Mr. Ramos. I'll wrap up.  Yeah. There's nothing for the Port to have preserved because the Port cannot control – cannot retain or reserve work that they do not control. They assigned all of the work, including the handling of the containers, over to ICSI. ICSI is servicing those containers that are owned by the carriers. The Port had nothing left to reserve. If they wanted to reserve something, they would have to deal with our carriers. They didn't do that, and therefore, they lack the control. The carriers have the control. Thank you very much. Thank all of you for your arguments in this complicated case. And Hooks v. NLRB is submitted, and we are in recess. Thank you very much. Thank you.
judges: Alarcon, Fisher, Berzon